# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

YVONNE BELANGER, individually and
on behalf of other similarly situated individuals,

       Plaintiff,

      vs.                               Civ. No. 19-317 WJ/SCY

ALLSTATE FIRE AND CASUALTY INSURANCE
COMPANY; ALLSTATE INDEMNITY
INSURANCE COMPANY; ALLSTATE
INSURANCE COMPANY; and ALLSTATE
PROPERTY AND CASUALTY INSURANCE
COMPANY,
              Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
## <u>REGARDING ATTORNEYS' FEES</u>

After the parties reached a settlement in this class action case, Plaintiff filed a motion

seeking approval of an attorneys' fees award for class counsel. Doc. 97. The Honorable William

P. Johnson referred this matter to me to determine "the amount of attorneys' fees and costs to be

awarded to Class Counsel and the amount of any service awards to be paid the Class

Representatives." Doc. 84 at 1. I recommend that the Court use the percentage-of-the-fund

method, with a lodestar cross-check, to calculate attorneys' fees for this contractual fee-shifting

case and award class counsel fees in the amount of $893,611.43. I also recommend that the Court

award an incentive fee to the named Plaintiff in the amount of $10,000.00.

### PROCEDURAL HISTORY

Named Plaintiff Yvonne Belanger filed this class action complaint on January 29, 2019 in

New Mexico state court, Doc. 1-4 at 1, and filed a First Amended Class Action Complaint on

February 13, 2019, Doc. 1-2. In the first amended complaint, Plaintiff alleges that, after she

sustained injuries in a collision with an underinsured motorist, Allstate denied her claim because

the tortfeasor's liability coverage limits equaled her underinsured motorist ("UIM") coverage limits. Doc. 1-2. She asserts that Allstate failed to inform her that the $25,000 minimum-limits UIM coverage she was paying for was illusory, given the *Schmick* offset. *Id.* Plaintiff defined the class as:

> All persons (and their heirs, executors, administrators, successors, and assigns) from whom Allstate collected a premium for an underinsured motorist coverage on a policy that was issued or renewed in New Mexico by Allstate and that purported to provide underinsured motorist coverage, but which effectively provides no underinsured motorist coverage and/or misleading underinsured coverage, because of the statutory offset recognized in *Schmick v. State Farm Mutual Automobile Insurance Company*, 704 P.2d 1092 (1985).

*Id.* ¶ 48. Plaintiff's first amended complaint alleged nine counts: negligence, violations of the New Mexico Unfair Trade Practices Act, violations of the New Mexico Unfair Insurance Practices Act, reformation of insurance policy, breach of covenant of good faith and fair dealing, unjust enrichment, negligent misrepresentation, declaratory judgment, and injunctive relief. *Id.*

Defendants removed the case to federal court on April 4, 2019, citing the Class Action Fairness Act. Doc. 1. Shortly thereafter, and before the Court held a scheduling conference to set discovery deadlines, Defendants moved to stay the case, pending resolution of a related question of law that had been certified to the New Mexico Supreme Court in *Crutcher v. Liberty Mutual Insurance Company*. Doc. 26. The certified question was:

> Under NMSA 1978, § 66-5-301 (1983), is underinsured motorist coverage on a policy that offers only minimum UM/UIM limits of $25,000 per person/$50,000 per accident illusory for an insured who sustains more than $25,000 in damages caused by a minimally insured tortfeasor because of the offset recognized in *Schmick v. State Farm Mutual Automobile Insurance Company*, 1985-NMSC-073, 103 N.M. 216, 704 P.2d 1092, and, if so, may insurers charge a premium for that non-accessible underinsured motorist coverage?

*Id.* at 1. On June 18, 2019, the Court granted the motion to stay, finding that the answer to the *Crutcher* certified question may resolve substantial issues in this case. Doc. 33. Likewise, the

Court stayed all discovery-related deadlines, including the deadline to exchange initial

disclosures. Doc. 29. On October 4, 2021, the New Mexico Supreme Court answered the

certified question, holding that

> UM/UIM coverage at the minimum level is permitted because the law not only allows, but requires, it to be sold as was done so here. However, such coverage is illusory because it is misleading to the average policyholder. As such, we will now require every insurer to adequately disclose the limitations of minimum limits UM/UIM policies in the form of an exclusion in its insurance policy. If the insurer provides adequate disclosure, it may lawfully charge a premium for such coverage.

*Crutcher v. Liberty Mut. Ins. Co.*, 2022-NMSC-001, ¶ 33, 501 P.3d 433, 441.

On December 14, 2021, the Court lifted the stay in the present case, Doc. 38, and set a

scheduling conference, Doc. 39. Plaintiff also filed a second amended complaint, amending the

factual allegations but alleging the same class definition and same counts as the first amended

complaint. Doc. 40. Defendants responded with a motion to dismiss, arguing that their policies

properly inform insureds of the amounts payable under UIM coverage and that the *Crutcher*

additional disclosure requirement only applies prospectively, not retrospectively. Doc. 42. At the

request of the parties, the Court stayed entry of a scheduling order while the motion to dismiss

was pending. Doc. 44. On March 2, 2022, the Court granted the motion to dismiss as to

Plaintiff's claims for negligence and unjust enrichment, but denied the motion as to all other

claims. Doc. 52. In doing so, the Court held that "the presumption of retroactive application has

not been overcome and therefore, *Crutcher* does not provide Defendants with immunity for

misrepresentation claims which arose pre-*Crutcher* and does not mandate dismissal of Plaintiff's

claims." *Id.* at 11.

Following the order on the motion to dismiss, the parties began settlement discussions,

including informally exchanging discovery necessary for such negotiations, and so the Court

further stayed entry of a formal scheduling order. *See* Docs. 56, 58, 59, 61, 63, 66. The parties

participated in a mediation on March 15, 2023. Although the case did not immediately settle, the parties continued negotiations, reached a settlement. Docs. 70, 72, 74, 76, 81, 82. As part of the settlement, Defendants agreed to pay Plaintiff's counsel attorneys' fees, including gross receipt tax and costs, in an amount to be determined by the Court, but not to exceed $2,250,000. Doc. 82-1 ¶ 63.

On August 22, 2023, the parties moved for preliminary approval of the class settlement. Doc. 82. On September 5, 2023, the Honorable William P. Johnson preliminarily approved settlement of this class action lawsuit and referred the final fairness hearing to me. Docs. 83, 84, 91. Between November 2023 and February 2024, the class administrator provided initial notice of the settlement to the class. Doc. 96-1 at 4-7 ¶¶ 7-9, 13. The notice informed the class of the fairness hearing, that class counsel would request attorneys' fees, costs, and expenses "not to exceed $2,225,000," and that the motion for attorneys' fee would be posted to the settlement website after it was filed. Doc. 96-1 at 13, 18, 21, 24.

Notably, the notice provides for a maximum amount of attorneys' fees that is $25,000 less than the parties agreed to as part of their settlement. Doc. 96-1 at 13, 18, 21, 24 (notifying the class that class counsel would seek an award of attorneys' fees, costs, and expenses "not to exceed $2,225,000"). Another section of the email notice, however, listed the higher amount, stating that "Allstate, subject to Court approval, will pay attorneys' fee of up to $2,250,000." Doc. 96-1 at 13, 17. And lastly, the email and mail notice also explained that, "[t]he motion for attorneys' fees will be posted on the website after it is filed." Doc. 96-1 at 14, 18, 21, 24.

On March 15, 2024, in anticipation of the final fairness hearing, the parties filed a motion to approve settlement, Doc. 96, as well as the present "Unopposed Motion and Memorandum of Law in Support of Class Plaintiffs' Petition for Award of Attorney's Fees, Costs, and Award of

Incentive Fee to Named Plaintiff," Doc. 97. In the motion for attorneys' fees, Plaintiff requests attorneys' fees in the amount of $2,250,000—$25,000 more than the maximum on least a portion of the class notice indicated Plaintiff's counsel could receive.

At the time of the filing of these motions, the class administrator was still gathering and approving class member claims, and so the total amount to be paid out to the class was not yet known. Doc. 97 at 14. Similarly, at the time of the final fairness hearing on March 26, 2024, the total amount to be paid out to the class was still unknown. Doc. 98. Accordingly, following the fairness hearing, I ordered the parties to file a supplement that set forth the amount of claims that had been paid out, the amount of claims expected to be paid out, and how many claims were still being evaluated. Doc. 99. The parties filed this supplement on April 30, 2024, Doc. 100. I also ordered Plaintiff's counsel to provide an accounting of hours worked on this case as well as the hourly rates for all attorneys and staff involved, Doc. 101, which they provided on May 29, 2024, Doc. 105. Finally, as to attorneys' fees, I ordered the parties to file briefs addressing whether *Chieftain Royalty Co. v. SM Energy Co.*, 100 F.4th 1147 (10th Cir. 2024), requires additional notice to the class regarding attorneys' fees. Doc. 107. The parties filed their respective briefs on June 11 and June 17. Docs. 108, 109.

On June 4, 2024, while briefing on the issue of attorneys' fees was being completed, I entered a Proposed Findings and Recommended Disposition ("PFRD"), recommending the Court grant the Motion for Final Approval of Class Settlement.[1] Doc. 106. On July 1, 2024, the Court

---

[1] As discussed more below, because the parties negotiated attorneys' fees separately from the class settlement and because the amount of attorneys' fees would not be affected by approval of the class settlement, I was able to issue a PFRD regarding approval of the class settlement separately from the present one regarding attorneys' fees.

adopted the PFRD and granted the motion for final class settlement approval. Doc. 111. Thus,

the only remaining matter in this case is the motion for attorneys' fee and incentive award.

## DISCUSSION

1. <u>**Notice to Class**</u>

As an initial matter, I address *Chieftain Royalty Co. v. SM Energy Co.*, a case the Tenth

Circuit published on May 1, 2024 (approximately six weeks after Plaintiff filed the present

motion for attorneys' fees). 100 F.4th 1147, 1151 (10th Cir. 2024). This decision raises an issue

as to whether the class is entitled to notice of recent information the Court received about

attorneys' fees, such as the number of hours Plaintiff's counsel worked and their proposed hourly

rate. For the reasons set forth below, I conclude that *Chieftain* does not require notice be sent to

the class about the additional fees information the Court received.

Like the present case, *Chieftain Royalty Co. v. SM Energy Co.*, involved the settlement of

a class action. 100 F.4th 1147, 1151 (10th Cir. 2024). Upon settlement, notice was sent to class

members informing them about the attorneys' fees award plaintiff's counsel sought (40% of the

$52,000,000 settlement fund). *Id.* Following a fairness hearing, and over objections from two

class members, the district court awarded plaintiff's counsel 33% of the settlement fund in

attorneys' fees (amounting to $17,333,333.33). *Id.* at 1152.

The objectors appealed and the Tenth Circuit reversed this attorneys' fees award. *Id.* The

court held that, under Oklahoma law, attorneys' fees should be evaluated according to the

lodestar method, not according to the percentage-of-the-fund method. *Id.* On remand, class

counsel filed a new motion for attorneys' fees (the 2018 motion) seeking a different amount than

requested in the 2015 motion. *Id.* at 1152-53. The 2018 motion also contained an "extensive

evidentiary record" not previously submitted to the district court, including time records and

declarations supporting attorney hours and rates. *Id.* at 1153. The settlement class was not notified of the 2018 motion. *Id.* Nonetheless, two class members who were aware of the 2018 motion filed objections. *Id.* Over their objections, the district court granted the 2018 motion. *Id.* at 1154.

An objector appealed, arguing that class-wide notice of the 2018 motion for attorneys' fees was required. *Id.* at 1155. The Tenth Circuit agreed, holding that, under the plain language of Rule 23(h)(1), class members were entitled to notice (and a new period of time for objections) of the renewed motion for attorneys' fees. *Id.* at 1157. It reasoned that, because "[t]he 2018 motion sought a different amount (33⅓% of the settlement fund) than did the 2015 motion (40% of the settlement fund), expressed the award sought as a dollar amount and not a percentage, and for the first time, supported the attorneys' fees request with evidence," the 2015 motion did not provide the class with sufficient notice of the renewed 2018 motion. *Id.* The Tenth Circuit held that "[w]ithout notice of the 2018 motion for attorneys' fees, the class lacked an opportunity to object to the new attorneys' fee request or scrutinize the supporting evidence previously unavailable." *Id.* at 1158. Significantly, even though the 2018 motion sought a smaller attorneys' fee award and provided more information, the Tenth Circuit declined to "make assumptions about how thousands of class members would have viewed the 2018 attorneys' fees motion had they been properly notified under Rule 23(h)." *Id.* at 1159.

Here, the parties provided notice of the settlement to class members by email or, for those who did not receive the email notice, by mail. Doc. 96-1 at 4-6 ¶¶ 7-8, 10. The notice informed class members that class counsel would request attorneys' fees, costs, and expenses not to exceed $2,225,000 and that the motion for attorneys' fee would be posted on the settlement website after it was filed. Doc. 96-1 at 13, 18, 20, 24. The notice further provided the link for that website. *Id.*

No class members objected to the fees request. After providing this notice to the class, Plaintiff filed an unopposed motion for attorneys' fees, seeking an award of $2,250,000, inclusive of costs and gross receipts tax, and arguing that amount is a reasonable percentage of the settlement funds.[2] Doc. 97.

Since that time, the Court has ordered Plaintiff to supplement the record with information about the total amount paid out to the class, an accounting of the time Plaintiff's counsel worked on the case, and Plaintiff's counsel's hourly rates. Docs. 100, 105. In the Notice of Submission of Attorneys' Fee Accounting, Plaintiff's counsel provided an accounting for each attorney and argued that if the Court applies a pure lodestar calculation to the fees request, it should also apply a multiplier of nine and award $2,176,973.91 in attorneys' fees. Doc. 105 at 4. The class was not notified of the supplemental documents. Thus, given the Tenth Circuit's reasoning in *Chieftain*, the question before the Court is whether Plaintiff needs to provide the class members notice of (and an opportunity to object to) the supplemental fees documents.

This case is similar to *Chieftain* in that the Court ordered Plaintiff's counsel to submit new information, including time records, in aid of a calculation that differs from the one counsel originally submitted. And, as in *Chieftain*, the parties did not provide notice to the class of the new information. Even so, I agree with the parties that *Chieftain* does not require supplemental notice to the class as a prerequisite to the award of attorneys' fees. *See* Docs. 108, 109. This is primarily because the result in *Chieftain* was the product of strict adherence to plain language in Federal Rule of Civil Procedure 23(h) that does not apply to the present case. As the *Chieftain* court observed, Rule 23(h) provides that a claim for an award of attorneys' fees "must be made

---

[2] As discussed below, given this discrepancy, I will treat $2,225,000 as the maximum amount of fees that Plaintiff seeks.

by motion" and that "[n]otice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). The Tenth Circuit held that, under the plain text of this Rule, because the plaintiff filed a new motion for attorneys' fees (the 2018 motion), class members were entitled to notice of the new motion, even though they received notice of the original 2015 motion for attorneys' fees. *Chieftain Royalty Co.*, 100 F.4th at 1157. Critically, Plaintiff's counsel in the present case did not file a new motion for attorneys' fees. Thus, under the plain language of Rule 23(h), further notice is not required.

Additionally, the plaintiff's attorneys in *Chieftain* were to be paid out of a common fund. *Id*. at 1151 n.2. This means every additional dollar paid to the plaintiff's counsel was one less dollar that would be paid to the class. In contrast, as Plaintiff's counsel in the present case points out, "the determination regarding the attorneys' fees to be awarded will have no effect on the class members' recovery. Those fees are being paid in addition to the class recovery and will not reduce that recovery in any way." Doc. 108 at 1. Thus, unlike *Chieftain*, the present case does not present a zero-sum situation. The Court's consideration of the additional information received can in no way threaten to reduce the amount any class member stands to recover.

Finally, the notice sent to class members in the present case informed them that "Class Counsel will file a motion asking the Court to award them attorneys' fees *not to exceed* $2,225,000 to be paid by Allstate." Doc. 96-1 at 13, 18, 21, 24 (emphasis added). In other words, the notice provided that what amount Plaintiff's counsel will receive, within this $2,225,000 cap, will be up to the Court. It should not be surprising to any class member reading this notice that the Court would receive additional information from Plaintiff's counsel before deciding how much to award in attorneys' fees. Neither Rule 23 nor *Chieftain* require notice be sent to every

class member every time the Court receives an additional piece of information relevant to the award of attorneys' fees. The parties here simply provided supplemental information at the Court's request so that the Court can fulfill its duty to "ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid." *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1187 (10th Cir. 2023) (citing Fed. R. Civ. P. 23(h) advisory committee's notes to 2003 amend.). Thus, neither Rule 23 nor *Chieftain* require the Court to order supplemental notice to the class before ruling on Plaintiff's motion for attorneys' fees. Accordingly, I now turn to Plaintiff's motion for attorneys' fees.

### 2. **Attorneys' Fees**

Plaintiff seeks the maximum amount of attorneys' fees allowed for under the terms of the settlement agreement—$2,250,000. However, because the class received notice that class counsel would request attorneys' fees not to exceed $2,225,000, $2,225,000 is the maximum amount of attorneys' fees for class counsel that the Court should consider. As such, throughout my analysis I will treat Plaintiff's motion for attorneys' fees as requesting $2,225,000 rather than $2,250,000. [3]

Rule 23 allows for an award of "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). To determine the reasonableness of Plaintiff's request, I first address the heightened scrutiny standard, then I consider the benefit to the settlement class, and lastly I address what method for calculating fees (lodestar or percentage-of-the-fund) I recommend the Court use in this case.

---

[3] Given that I recommend fees in a lower amount than either $2,225,000 or $2,250,000, even assuming the class did receive notice that class counsel would request fees in the higher amount of $2,250,000, my analysis in this PFRD would stay the same.

### a. A "heightened scrutiny" standard of review applies to the request for attorneys' fees.

Because the attorneys' fees agreement the parties reached is a "clear sailing" agreement with a "kicker," Tenth Circuit precedent requires the Court to review the agreement with "heightened scrutiny." [4] *See In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 997 F.3d 1077, 1091 (10th Cir. 2021). A "kicker" is an agreement that "allows all fees not awarded to class counsel to revert to defendants rather than be added to the cy pres fund or otherwise benefit the class." *Id.* at 1088 (internal quotation marks and alterations omitted). Under the terms of the present settlement agreement, if the Court does not approve the entire $2,250,000 in attorneys' fees, any amount not paid will revert to Defendants (as opposed to reverting to a fund for class members). *See* Doc. 102 at 7:11-20. Thus, the present settlement agreement contains a "kicker" agreement.

A 'clear sailing' agreement is one where the defendant agrees not to object to an award of attorneys' fees specified in a settlement agreement." *In re Samsung,* 997 F.3d at 1088 (alterations and some internal quotation marks omitted). Defendants here have agreed not to object to an award of attorneys' fees in an amount up to $2,250,000, inclusive of costs and gross receipt tax. Doc. 97 at 1. Defendants will pay this amount in addition to and separate from payment to the class members. *Id.* Thus, the attorneys' fees agreement contains a "clear sailing" provision.

Essentially, *In re Samsung* recognizes that when faced with agreements that contain kicker and clear sailing provisions, the Court must carefully scrutinize the attorneys' fees

---

[4] As part of this heightened scrutiny, the Tenth Circuit has instructed courts faced with a settlement containing both a kicker and a clear-sailing agreement to "carefully consider whether the settlement was negotiated at arms-length." *In re Samsung*, 997 F.3d at 1091. I found the parties negotiated the settlement at arms-length at the final fairness hearing and in the previous PFRD addressing the motion to approve settlement, which the Court has adopted. Doc. 106 at 5-6; Doc. 111.

requested because, most likely, no one else will. Consider a class member's incentive to object. Under the clear terms of the settlement agreement, if the Court awards less than $2,250,000 in attorneys' fees, the difference between $2,250,000 and the amount awarded does not revert to the class (the kicker provision states it reverts to Defendants). Therefore, a class member who mounts a successful challenge to the $2,250,000 requested (or the $2,225,000 requested in the class notice) stands to gain nothing. It is unlikely that any class member, who will receive nothing in exchange for any time and expense incurred challenging the requested attorneys' fees, would take the initiative to mount such a challenge even if they disagreed with the amount of requested attorneys' fees.

The kicker provision, of course, does provide Defendants with an incentive to challenge Plaintiff counsel's requested attorney fees—every dollar under $2,250,000 the Court does not award in fees for Plaintiff's attorneys is money in Defendants' pocket. But this is where the clear sailing provision comes in. Although Defendants have the *incentive* to challenge Plaintiff counsel's requested attorney fees, the clear sailing agreement deprives them of the *ability* to do so. As part of the settlement, Defendants agreed not to challenge any award of attorneys' fees to Plaintiff's counsel up to $2,250,000. Because Defendants do not have the ability to object to the attorneys' fees application and because class members do not have the incentive to do so, it falls on the Court to scrutinize the application. *See In re Samsung*, 997 F.3d at 1081.

Courts must also review these agreements with heightened scrutiny because what is in the best interests of a defendant and of a plaintiffs' attorney may not be in the best interests of the class. From a defendant's perspective, the total amount it must pay out typically is of greater concern than how the class and the class attorney divide up that amount. If the cheapest way a defendant can settle a case is to pay the class little but pay the class attorney handsomely, it is

economically rational for the defendant to enter into such an agreement. Thus, a court cannot depend on a defendant to object to an unreasonably high fee for the class attorney. A defendant's incentive to agree to a deal that may not be in the best interests of the class only increases where the deal includes a "kicker", meaning that any unawarded attorneys' fees revert to the defendant rather than to the class. *See In re Samsung*, 997 F.3d at 1090-91 ("[T]he Ninth Circuit has recognized that where a settlement agreement contains a 'kicker' and a 'clear-sailing' agreement, the district court has a special obligation to assure itself that the fees awarded in the agreement were not unreasonably high for, if they were, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained.") (cleaned up).

Similarly, a class attorney has a personal financial incentive to accept a deal that pays the attorney well but that may not be in the best interests of the class. Although a plaintiffs' attorney has a duty to put the clients' interests first, in recognition of the potential financial conflict of interest that may exist between a class action attorney and that attorney's clients, a court has a fiduciary duty to review with heightened scrutiny clear sailing agreements that have a kicker. *Id*. at 1091 ("Faced with a settlement containing a 'kicker' agreement and a 'clear-sailing' agreement, a district court must carefully consider whether the settlement was negotiated at arms-length. As part of this evaluation, the district court shall take special care to assure the class members receive fair and reasonable compensation based on record evidence of their actual damages and the likelihood of success at trial.").

In the present case, however, I conclude no financial conflict of interest exists. Here, Plaintiff's counsel and Defendants' counsel negotiated the settlement agreement in two stages.

They first reached a settlement on behalf of the class and, only after having reached such an

agreement, did they negotiate an agreement on attorneys' fees. No evidence exists that class

counsel and defense counsel colluded to expand attorneys' fees at the cost of class compensation.

Nonetheless, as set forth above, Tenth Circuit precedent still requires the Court to review the

attorneys' fees agreement in this case with heightened scrutiny. This analysis begins with

determining what the class actually received.

> **b. The benefit of the settlement to the class is more appropriately measured by what the class actually received than by what the class potentially could have received.**

Attorneys' fees must be reasonable, regardless of whether the attorneys are paid by hour

or by percentage. *See Syngenta*, 61 F.4th at 1193 ("because the touchstone of a fee award

analysis is reasonableness, we do not require rigid adherence to either the percentage-of-the-fund

or lodestar methods in the common fund context"); *In re N.M. Indirect Purchasers Microsoft

Corp.*, 2007-NMCA-007, ¶ 32, 149 P.3d 976, 991 ("In the majority of jurisdictions, the district

court has discretion to determine which method should be used to award fees under the common

fund doctrine, depending on the circumstances of each particular case."). Further, regardless of

how attorneys in a class action are paid, the reasonableness of their fees should be considered

with reference to the overall settlement amount. *Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d

1167, 1177 (10th Cir. 2016). Thus, before addressing whether Plaintiff's attorneys should be

paid by the hour or as a percentage of the settlement obtained, I first consider the benefit to the

settlement class.

In considering the benefit to the class as part of the attorneys' fees analysis, I recommend

that the Court consider what class members *actually* received rather than what class members

*could have received*, had Defendants readjusted every potential class member claim for a

maximum amount. *See Sanchez v. Martinez*, 1982-NMCA-168, ¶¶ 19-20, 653 P.2d 897, 902-03 ("An award of damages predicated upon conjecture, guess, surmise or speculation is improper. A party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty."); *see also Fager*, 854 F.3d at 1177 ("[w]e see merit in an approach that ties attorney recovery to the amount actually paid to the class" and favorably citing *Pearson v. NBTY, Inc*., 772 F.3d 778 (7th Cir. 2014), which held that the class benefits do not include administrative costs); Barbara J. Rothstein & Thomas E. Willging, Managing Class Action Litigation: A Pocket Guide for Judges 33 (3d ed. 2010) ("Insist on actual information on claims filed to determine the benefit to class members and use that information both to place a value on the settlement and to award attorney fees."); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig*., 851 F. Supp. 2d 1040, 1075 (S.D. Tex. 2012) ("[T]he court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits actually delivered." (quoting Manual for Complex Litigation, Third § 21.71 (1995))).

Consider, for example, *Charlie v. Rehoboth McKinley Christian Health Care Services*. The plaintiffs' counsel in this data breach class action sought the maximum amount in fees they could request under the settlement agreement—$300,000. No. CV 21-652 SCY/KK, 2023 WL 4591167, at *1 (D.N.M. July 18, 2023). They argued that the "settlement benefit is conservatively valued at $2,379,083" and that the $300,000 they were requesting was only 12.6% of this amount. *Id.* at *3. But the class in *Charlie* did not receive $2,379,083. *Id.* at *5. Instead, the amount actually paid to the class was only $45,319.30. *Id.* Much of the benefit to the

class (such as credit monitoring) was difficult to quantify.[5] *Id.* at *4. The court concluded it would be unreasonable to pay plaintiff's counsel a percentage of some amount of money the class never received. *Id.* at *11 ("In assessing the reasonableness of fees awarded, the Court must compare the amount Plaintiffs request for their attorneys to what the class is receiving."). And, looking to the amount of money the class did receive, the court concluded it would be unreasonable to award plaintiffs' attorneys more than 600% of what the class received.[6] *Id.*

I therefore turn to considering what benefit the present class will actually receive. Under the terms of the settlement agreement, the benefits to the class members are paid in one of three ways. The first way relates to wrongful death claims. Defendants will automatically readjust wrongful death claims (made within a certain time period) where UIM benefits were reduced or denied due to the *Schmick* offset. Doc. 82-1 ¶ 15 (settlement agreement). The total payout for these claims is $1,042,333. Doc. 97 at 14.

Second, under "Option 1" payments, Defendants will readjust certain claims for injuries or property damage of class members who submitted a claim. Doc. 82-1 ¶ 16(a). There is no cap on this amount. At the time Plaintiff submitted the motion for attorneys' fees, the claims administrator was still receiving and reviewing claims, so the exact amount of the payout under Option 1 was not yet known. Doc. 97 at 14. The claims administrator estimated the Option 1 payout to be around $1.9 million for a total of 64 claimants. Doc. 96-1 ¶ 22; Doc. 97 at 14.

---

[5] Accepting the *Charlie* plaintiffs' value of the credit monitoring (what it would cost each plaintiff to individually buy such monitoring on the open market rather than what the defendant paid for such monitoring), the benefit to the class of the credit monitoring would still have only been $159,166.80. *Id.* at *4.

[6] Notably, unlike the present case, the plaintiffs' counsel in *Charlie*, never advocated to receive a percentage of money the class actually received, as a 33% fee would have yielded only $15,000 in attorneys' fees.

Plaintiff further estimated that "there are 844 Settlement Class Members who have been identified within the Option 1 population in the Class List where additional information has been requested. Assuming a recovery of $25,000 limits for these claims, the estimated valuation of these Option 1 claims could be as much as $22,100,000."[7] Doc. 97 at 14. In the later-filed supplement, however, Plaintiff reported that the *actual payout* under Option 1 is much less—roughly a total of $120,000 paid to 6 claimants. Doc. 100 ¶ 5(a).

Third, under "Option 2" Defendants will make payments to certain policyholders (who made a claim) for reimbursement of UIM premiums, with a cap of $2,200,000. Doc. 82-1 ¶ 16(b). Even if the Option 2 claims do not equal $2,200,000, Defendants will pay out that total amount with the residual distributed equally to the Option 2 claimants. *Id.*

The benefit to the class also arguably includes two more items. First, it arguably includes the value of the administrative services provided by Epiq Class Action & Claims Solutions, Inc., which Defendants will pay. Doc. 82-1 ¶ 26. In the supplement filed May 29, 2024, Plaintiff states that the administrative costs to date are $212,112.73. Second, it arguably includes the value of the attorneys' fees. That is, because Defendants will pay the attorneys' fees separate from the sum to be paid to the class, as opposed to paying a sum to the class from which attorneys' fees will be taken thus diminishing the total amount to be distributed to the class, the amount of the attorneys' fees to be paid is arguably part of the benefit to the class. *See In re Heartland*, 851 F. Supp. 2d at 1080 (including attorneys' fees as part of value of settlement). If

---

[7] In its motion for preliminary approval, Plaintiff likewise speculated that the benefit to the class could total as much as $15,000,000 with $12,500,000 million paid out in Option 1 claims. Doc. 82 at 14.

Plaintiff's counsel were to receive one-third of the total amount recovered, the attorneys' fees would equal $1,787,222.86.[8]

> Lastly, in the supplement, Plaintiff asserts that
>
> Allstate has resolved at least 15 claims/suits alleging offset claims outside the class settlement for amounts which included approximately $724,000 in offsets and are continuing to review at least 4 additional claims/suits outside the class settlement alleging up to $100,000 in offset claims for a total of $824,000. The parties agree that the resolution of these cases reflect the activities of class counsel and this class action.

Doc. 97 ¶ 5(e). In other words, Plaintiff argues that, when the Court considers the benefit to the class members, it should consider payments made to non-class members in separate lawsuits. Plaintiff offers no authority to support an argument that claims resolved in separate lawsuits should be considered in this case, and I recommend that the Court decline to do to. Considering payments made in separate lawsuits is problematic because it could result in double compensation for the attorneys. That is, the attorneys in the other cases may have already been compensated for their work in those other cases. And, if they have not already been compensated, their compensation should proceed according to whatever agreement they have in those other cases. In the present case, the Court is evaluating the benefit to its class members. The Court has no jurisdiction over plaintiffs who are not part of the present case and Plaintiff has provided no persuasive justification for the Court to consider payment to plaintiffs outside its jurisdiction when determining what attorneys' fees are reasonable in connection with work done for the class members over which the Court does have jurisdiction.

---

[8] $3,574,445.73 is the total benefit to the class for the wrongful death claims, Option 1 claims, Option 2 claims, and administrative fees. If $3,574,445.73 constitutes two-thirds of the settlement, an additional one-third for attorneys' fees would be an addition of $1,787,222.86.

In sum, although Plaintiff initially theorized that the benefit to the class could reach over $22 million, the actual benefit to be paid is much less: $1,042,333 for wrongful death claims; $120,000 for Option 1 claims; $2,200,000 for Option 2 claims; $212,112.73 for administrative costs; and $1,787,222.86 for attorneys' fees (assuming an award of 33.33%). This adds up to $5,361,668.60.

### c.  **The present case is a contractual fee-shifting case.**

The benefit a class receives, however, is not the only factor that affects the attorneys' fees calculation. How the settlement is characterized and the method employed to assess a reasonable attorneys' fees also matters. Judge Hansen in this district has recognized that "there are two generally accepted means for awarding attorneys' fees in class action suits, the so-called lodestar method—determining fees based on the hours worked and a reasonable hourly fee—and the percentage-of-the-fund method—awarding fees based on a reasonable percentage of the overall award." *Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1095 (D.N.M. 1999). How the settlement is characterized plays a part in determining which method to use. Thus, I begin my analysis by characterizing the present settlement.

If this case could be properly characterized as a case arising under a fee-shifting statute, the question of what method to use to calculate fees would be easy—Supreme Court precedent mandates use of the lodestar method. *See City of Burlington v. Dague,* 505 U.S. 557, 562 (1992); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010). Likewise, if this case could be properly characterized as a common fund case, the question of what method to use would be easy—percentage-of-the-fund is the method most commonly used to determine fees in such cases. *See In re Syngenta*, 61 F.4th at 1191. Here, Plaintiff characterizes this case as "the *equivalent* of a common fund established for the benefit of the settlement class members . . . ."

Doc. 97 at 3-4. (emphasis added). Based on this characterization, Plaintiff then cites numerous cases in which courts have applied the percentage-of-the-fund method en route to awarding attorneys' fees equal to one-third or more of the settlement amount.[9] Although I agree that the present case has some attributes of a common-fund case that are relevant to the Court's analysis of what attorneys' fees are reasonable, I disagree that the present case is the equivalent of a common-fund case.

"A common-fund case is when 'a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'" *In re Home Depot Inc.*, 931 F.3d 1065, 1079 (11th Cir. 2019) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). As the Tenth Circuit recently explained in a common-fund case,

> In large class actions such as this, a relatively small handful of plaintiffs bear the cost of suit. If those plaintiffs prevail, their success benefits the entire class. Were the American Rule to apply in this context, the named class plaintiffs would shoulder the costs of suit—including attorneys' fees—for the entire class, even as the remainder of the class reaps the benefits of their labor. The common fund doctrine prevents such unjust enrichment by enabling class action attorneys to extract fees from the collective award, thereby spreading the costs of suit proportionately among the ascertainable class.

*Syngenta*, 61 F.4th at 1191-92 (internal quotation marks and citations omitted); *see also Home Depot*, 931 F.3d at 1079 (in common-fund cases, "the attorney's fees come from the fund, which belongs to the class. In this way, the client, not the losing party, pays the attorney's fees").

In the present case, the losing party, not the client, is paying the attorneys' fees. The clear terms of the settlement provide that Defendants will pay the attorneys' fees separate from the settlement funds to be paid to the class and any reduction in attorneys' fees will revert to

---

[9] However, Plaintiff never actually states what percentage of the fund class counsel is presently seeking or even what the total fund is. Instead, Plaintiff simply cites cases approving fees in the amounts of 33.33%, 35%, and 40% of the settlement. Doc. 97 at 4-6, 8.

Defendants, not to the class fund. Indeed, Plaintiff acknowledges in her motion that "the proposed award of attorney fees does not draw from or diminish the common fund at all but is agreed to be paid by Defendant[s] as a separate feature of the settlement without reduction of the substantial benefits secured for the class members." Doc. 97 at 3. Thus, present case is not a common-fund case or the equivalent of a common-fund case.

Nor is this case a constructive common-fund case. A constructive common fund involves a situation where "the defendant negotiated the payment to the class and the payment to counsel as a package deal." *Home Depot*, 931 F.3d at 1080 (internal quotation marks and citation omitted). If the case were a constructive common fund case, the Court might follow the lead of other courts and conclude that it should be "governed by common-fund principles even when the agreement states that fees will be paid separately." *Id*. Because Plaintiff and Defendants did not negotiate payment to the class and the payment to counsel as a package deal, however, this case cannot be characterized as a constructive common fund case. *See* Doc. 82-1 ¶ 62 ("[t]he Parties did not discuss the payment of attorneys' fee, costs, expenses, and/or Incentive Award to Plaintiffs until after the substantive terms of the settlement had been agreed to.").

Instead, this case is better characterized as a contractual fee-shifting case. As the Eleventh Circuit explained in *Home Depot*, which involved a similar attorneys' fee provision:

> On its face, the settlement agreement provides that Home Depot will pay the attorney's fees. The agreement states that "Home Depot agrees to pay the reasonable attorneys' fees, costs and expenses of counsel for the Financial Institution Plaintiffs." Even more explicit, the agreement goes on to state that "[a]ny award of attorneys' fees, costs, and expenses shall be paid separate from and in addition to the Settlement Fund." That sounds like fee shifting. Indeed, it is hard to imagine how the settlement agreement could be any clearer that Home Depot will pay the attorney's fees, and that payment will not come out of the class fund. A settlement agreement is a contract, which we construe "to effectuate the intent of the parties," *Pottinger v. City of Miami*, 805 F.3d 1293, 1298 (11th Cir. 2015), and the parties' intent seemed to be for the fees to be paid separately by Home Depot—i.e., a fee-shifting arrangement.

931 F.3d at 1079–80. Similarly, in the present case, Defendants have agreed to pay the attorneys' fees and that payment of those fees will not come out of the class fund. Because the parties in the present case contracted to have Defendants pay the fees for Plaintiff's attorneys, I recommend that the Court characterize this case as a contractual fee-shifting case rather than as a common-fund case. *See id.* at 1079 ("[T]he key distinction between common-fund and fee-shifting cases is whether the attorney's fees are paid by the client (as in common-fund cases) or by the other party (as in fee-shifting cases.)").

### d. The percentage-of-fund method should be used in this contractual fee-shifting case.

Although *Home Depot*'s analysis helps to characterize the present case, it is not helpful in determining whether a lodestar or a percentage-of-the-fund method should be used to calculate attorneys' fees. This is because neither the district court nor the Eleventh Circuit in *Home Depot* contrasted the advantages and disadvantages of each method. 931 F.3d at 1082. Rather than engaging in this analysis, the Eleventh Circuit acknowledged that "Class Counsel may be right that the District Court had discretion to choose . . ." between a lodestar or percentage-fund method, but decided that, "because the parties do not challenge the District Court's use of the lodestar method, we do not question it." *Id.* at 1082.

Like the plaintiff in *Home Depot*, Plaintiff in the present case asserts that which method to employ is within the Court's discretion. Doc. 108 at 2-3. I agree. *See Home Depo*, 931 F.3d at 1081-82 (concluding that, within the Eleventh Circuit, although the Supreme Court has said that courts should use the lodestar method in statutory-fee-shifting cases, in contractual fee-shifting cases the appropriate method "is not clearly governed by any binding precedent"). Such discretion allows courts to review settlements on a case-by-case basis. It also "works more effectively because there's some ex ante uncertainty about which method a district court will use.

Lawyers can't game the system if they don't know what system will be used." *Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 627 (6th Cir. 2020).

The more difficult question is which method the Court should apply in this case. Plaintiff asserts, "The requested attorney's fees of [$2,225,000] is well within the range of the customary percentage the parties have agreed to and which the reported cases have established." Doc. 97 at 12. Plaintiff does not justify this request with either a percentage-of-the-fund or a lodestar calculation, however. That is, although arguing that the requested fees are a reasonable percentage of the common fund, Plaintiff proffers no calculation for the Court to review. Nor does Plaintiff ever say precisely what percentage she is seeking.

At my request, Plaintiff's counsel did provide an accounting of hours worked and hourly rates. Docs. 105-1, 105-2, 105-3. Applying a lodestar calculation by multiplying the hours worked by the hourly rate would yield a fee of about 10% of Plaintiff's counsel's request. Applying a percentage-of-the-fund calculation of one-third to the amount actually paid to the class would also yield a fee lower than the requested fee, albeit one much higher than a lodestar fee. Consequently, what fee the Court ultimately awards in this case will be heavily influenced by whether the Court uses a percentage-of-the-fund method or lodestar method to calculate fees.

The settlement in the present case has features similar to statutory fee-shifting cases (where a lodestar method is used). The obvious common thread between the present contractual fee-shifting case and a statutory fee-shifting cases is that they are both fee-shifting—the losing party, not the class, pays the fees. However, there are also differences between the present case and Supreme Court cases that address the award of attorneys' fees in statutory fee-shifting cases.

For instance, the class in *Perdue* received injunctive and declaratory relief rather than a pool of money. 559 U.S. at 547. The *Perdue* court further recognized that, "In many cases,

attorney's fees awarded under § 1988 are not paid by the individuals responsible for the

constitutional or statutory violations on which the judgment is based. Instead, the fees are paid in

effect by state and local taxpayers, and because state and local governments have limited

budgets, money that is used to pay attorney's fees is money that cannot be used for programs that

provide vital public services." *Id*. at 559. In contrast, the attorneys' fees here are being paid by

Defendants who have no objection to any amount up to the negotiated cap.

      The present settlement also differs from a traditional contractual fee-shifting case where

the parties agree in a contract that the losing side will pay reasonable attorneys' fees if litigation

ensues. A lodestar calculation is likely appropriate for such a situation where the focus is on fees

expended to prevail and not on what the class recovers. Here, however, the parties entered a

contract related to the payment of attorneys' fees *after* litigation began and *after* they reached a

settlement as to the class. Thus, at the time the parties entered a contract related to attorneys'

fees, Plaintiff's counsel could have provided defense counsel with their hours worked and hourly

rate to reach a lodestar amount of attorneys' fees. Instead of agreeing to such a lodestar amount,

however, the parties agreed to a maximum amount of attorneys' fees that greatly exceeds the

applicable lodestar amount that was available to the parties at the time they entered their

attorneys' fees contract. As such, the same lodestar presumption that might exist in a traditional

contractual fee-shifting case does not exist in the present case.

      Relatedly, this case also differs from a contractual fee-shifting case in which the attorneys

sought fees based on a potential rather than actual recovery and based on a benefit that is

difficult to value. *Cf. Charlie*, 2023 WL 4591167, at *3-5. Here, unlike in *Charlie*, the actual

value to the class is easily ascertainable. Thus, the present case may be one of those cases the

court recognized in *Charlie* where, "even [though] there is no common fund, it may [] still be

appropriate to calculate attorneys' fees by first calculating the total value of the settlement to the class and then multiplying that number by a reasonable percentage for attorneys' fees." *Id.* at *7.

I further agree with Plaintiff that the settlement's "substantial guaranteed pay out to class members" does militate in favor of applying the percentage-of-the-fund method to calculate attorneys' fees. Doc. 105 ¶ 14. At least a portion of the settlement—the $2.2 million for Option 2 claims—is properly characterized as a common fund. This feature does resemble common-fund settlements where plaintiffs' attorneys are paid a percentage of the fund—both settlements involve a pool of money set aside for the benefit of the class.

Of course, this non-revertible payout of $2.2 million in connection with the Option 2 claims is not the only feature of the parties' settlement. The payout on other features of the settlement do not involve a guaranteed pool of money. Instead, payout on the wrongful death and Option 1 claims depends on readjustment of those claims. Thus, Defendants' liability for these claims was determined by factors unknown at the time of the settlement. Now, however, this liability is known and can be calculated as part of the pool of money the class will receive.

Further, although "the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," *Perdue*, 559 U.S. at 551, it does not approximate the fee a prevailing attorney would have received if he or she was representing clients who paid the attorney a fee based on a percentage of what the clients recovered. Plaintiffs' attorneys are typically paid a percentage—usually between 33% and 40%—of whatever they recover for their clients. Thus, the percentage-of-the-fund method is most consistent with the typical contingency fee arrangement between plaintiffs' counsel and their clients. And, typical practices are a factor the Supreme Court recognized in *Perdue* (albeit in

favor of a lodestar method in that case). 559 U.S. at 556 ("As we have noted, the lodestar was adopted in part because it provides a rough approximation of general billing practices, and accordingly, if hourly billing becomes unusual, an alternative to the lodestar method may have to be found.").

Another benefit of applying the percentage-of-the-fund method in this case is to incentivize parties engaged in settlement discussions in similar cases to negotiate the payment of attorneys' fees separate from, and after, agreeing to what the class will recover. Negotiating attorneys' fees after negotiating a settlement for the class helps plaintiffs' attorneys avoid a conflict with the class over what percentage of the fund the plaintiffs' attorneys should receive. This is because, if the plaintiffs' attorneys' fees comes out of the recovery for the class, the more the attorneys receive, the less their clients receive. Plaintiffs' attorneys seeking to avoid this conflict might negotiate a settlement in which a defendant agrees to pay the attorney separate from the class.

But engaging in attorney-fee negotiations at the same time as class-settlement negotiations creates a separate risk: the risk of collusion between defendant and plaintiffs' counsel in which plaintiffs' counsel has an incentive to sell out the class. As discussed above, if the cheapest way a defendant can settle a case is to pay the class little but pay the class attorney handsomely, it is economically rational for the defendant to enter into such an agreement. And, an unscrupulous plaintiff's attorney might compromise the class claim for less than it is worth in exchange for a higher agreed-upon attorney fee.

These concerns for collusion at the expense of the class are diminished where plaintiffs' counsel's fees are determined by a percentage actually paid to the class. A plaintiffs' counsel who will be paid a percentage of what the class recovers (even an unscrupulous one) has no

personal financial incentive to settle the class claim for less than it is worth. And a plaintiffs'
counsel who negotiates a contractual fee-shifting cap only after reaching a settlement for the
class has no concern that successfully advocating for more fees will necessarily reduce the class
recovery. Thus, awarding a percentage of the fund to attorneys who negotiate a contractual fee-
shifting cap after the class settles reduces the risk of conflicts of interest between plaintiffs'
counsel and their clients and helps protect the class from attorneys who might place their
financial interests above those of the class.

   Although compelling reasons exist to pay plaintiffs' counsel through a percentage-of-the-
fund method in cases such as the present case, compelling reasons also exist for courts in class
actions to resist automatically defaulting to the same fee percentages that typically apply outside
the context of class actions. This is because the percentage-of-the-fund method carries the risk
that class attorneys will be excessively compensated. The potential for an oversized award may
arise when an attorney obtains a large settlement compared to the number of hours the attorney
has worked. For instance, an attorney who worked 2,000 hours en route to a $100 million dollar
settlement would receive nearly $17,000/hour at a 33% contingency rate. Thus, in "mega" class
actions, courts should "look at a percentage of recovery far less than the typical range and
perhaps as low as 4%." Managing Class Action Litigation: A Pocket Guide for Judges, at 36.
That is, even when using the percentage-of-the-fund method, courts should be cognizant of the
resulting hourly rate.

   In cases such as this where class members are primarily paid through a fund as part of a
settlement, applying the percentage-of-the-fund method and then cross-checking with a loadstar
amount provides a guardrail against excessive attorneys' fees in class actions and is most likely
to lead to the payment of attorneys' fees that are reasonable. *See, e.g., Perdue*, 559 U.S. at 551

(noting that, in the context of statutory fee-shifting cases, the lodestar calculation is "the guiding light of our fee-shifting jurisprudence"). Because strict adherence to either the lodestar or the percentage-of-the-fund method can lead to anomalous results, courts have used one method to be cross-checked by the other. *See*, *e.g.*, *Montgomery v. Cont'l Intermodal Grp.-Trucking LLC*, No. 19-940 GJF, 2021 WL 1339305, at *7 n.5 (D.N.M. Apr. 9, 2021); *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1265 (10th Cir. 2023) (holding that the district court did not abuse its discretion in applying a lodestar cross-check to a common fund case). I therefore recommend that the Court use a percentage-of-the-fund, cross-checked by the lodestar calculation, to determine the amount of reasonable fees in this case.

### e. Using the percentage-of-the-fund method, cross-checked with the lodestar method, I recommend attorneys' fees in the amount of 20% of the settlement fund.

As discussed above, Plaintiff does not state what percentage of the settlement fund she is seeking for attorneys' fees, nor does she provide a total of the settlement fund from which to take a percentage.[10] Instead, she cites cases approving fees in the amounts of 33.33%, 35%, and 40% of the settlement. Doc. 97 at 4-6, 8. If the total benefit of the settlement to the class is $5,361,668.60, a one-third contingency fee would yield attorneys' fees in the amount of $1,787,222.86, nearly $500,000 less than the amount of attorneys' fees Plaintiff's counsel requests.

To cross-check this amount, I will also engage in a lodestar calculation. As noted, lodestar is the "the number of hours reasonably expended on the litigation multiplied by a

---

[10] In her motion for final class approval, Plaintiff does briefly mention attorneys' fees and speculates that the "benefits conferred onto the class may exceed $15,000,000," such that the requested $2,225,000 in fees "represents 15% of the potential Settlement class benefits." Doc. 82 at 14. As discussed above, the actual benefit to the class is much lower than $15,000,000.

reasonable hourly rate." *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1102 (10th Cir. 2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar "produces a presumptively reasonable fee that may in rare circumstances be adjusted to account for the presence of special circumstances." *Id.*

  i. <u>Hourly Rate</u>

  "To determine what constitutes a reasonable rate, the district court considers the prevailing market rate in the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (internal quotation marks omitted). The Court must review "evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community." *Id*. at 1224-25. "The establishment of hourly rates in awarding attorneys' fees is within the discretion of the trial judge who is familiar with the case and the prevailing rates in the area." *Lucero v. City of Trinidad*, 815 F.2d 1384, 1385 (10th Cir. 1987); *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) ("The setting of a reasonable hourly rate is within the district court's discretion."). "Only if the district court does not have before it adequate evidence of prevailing market rates may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate." *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan*., 157 F.3d 1243, 1257 (10th Cir. 1998).

  Plaintiff requests an hourly rate for all three class counsel (Kedar Bhasker, Corbin Hildebrandt, and Geoffery Romero) in the amount of $500 per hour. Doc. 105 at 2. That rate is higher than rates courts in this district have recognized as the prevailing market rates in New Mexico. *E.g.*, *Rael v. Aldridge, Hammar & Wexler, P.A*., No. 22cv446, 2023 WL 3648986, at *2 (D.N.M. May 25, 2023) ($300 per hour); *Salazar v. Green Square Co., LLC*, No. 21cv542, 2022 WL 1492577, at *11 (D.N.M. Mar. 16, 2022) ($295 per hour), *report and recommendation*

*adopted*, 2022 WL 1115271 (D.N.M. Apr. 14, 2022); *Bd. of Directors of Four Directions Park Condominiums Homeowners Ass'n, Inc. v. Casita De Las Flores, LLC*, No. A-1-CA-36435, 2020 WL 1815949, at *6 (N.M. Ct. App. Mar. 12, 2020) ($250 per hour); *Lucero v. Debt Recovery Attys.*, No. 19cv106 JAP/LF, 2020 WL 556898 (D.N.M. Feb. 3, 2020) ($292.08 per hour); *New Mexico Found. for Open Gov't v. Corizon Health*, 2020-NMCA-014, ¶ 28, 460 P.3d 43, 53 ($400 is "high end of the market range" but reasonable); *Vinyard v. New Mexico Hum. Servs. Dep't*, No. A-1-CA-36717, 2019 WL 6728859, at *9 (N.M. Ct. App. Nov. 12, 2019) ($160 per hour for time as a licensed lawyer and $100 for time as a paralegal); *XTO Energy, Inc. v. ATD, LLC*, No. 14cv1021, 2016 WL 1730171, at *32 (D.N.M. Apr. 1, 2016) ("[t]he Court has approved rates of $300.00 per hour and other judges in New Mexico have found rates of $350.00 per hour reasonable, but most rates in New Mexico are lower" and "a $400 rate would be close to the top, if not the top of the rates that the court has approved or seen in New Mexico"); *Charlie v. Rehoboth McKinley Christian Health Care Servs.*, No. CV 21-652 SCY/KK, 2023 WL 4591167, at *15 (D.N.M. July 18, 2023) ($400 per hour). Like the price of other services, attorney hourly rates are subject to inflation. Even considering inflation, however, the Plaintiff's counsel's hourly rate of $500/hour would be at the top end of rates the most experienced attorneys in New Mexico charge. Although high, for purposes of a lodestar cross-check, I do not find these rates to be unreasonable.

      ii.  <u>Number of Hours</u>

      Having reviewed the time account for each attorney, I agree with Plaintiff that the number of hours class counsel spent on this case was reasonable and efficient. *See* Docs. 105-1, 105-2, 105-3. Additionally, although the legal issues in this case overlap with similar cases

which counsel pursued, counsel provided an accounting of work attributable only to the present case. Doc. 105 ¶¶ 2-4.

      iii.  Expenses

Plaintiff provides that she incurred costs in the amount of $17,475 for mediation. Doc. 105-4. Additionally, in attorney Corbin Hildenbrandt's billing sheet, he lists other expenses such as filing and service fees (excluding the mediation fee), for a total of $484.03. Doc. 105-2. Thus, the total for expenses is $17,959.03. These expenses are relatively low, given the age and complexity of the case and I find that they are reasonable.

      iv.  Lodestar Sum

In sum, the lodestar amount equals $250,444.03, as calculated below.[11]

| Biller | Hours | Rate | Total |
|---|---|---|---|
| Kedar Bhasker | 189.05 | $500 | $94,525 |
| Corbin Hildebrandt | 159.12 | $500 | $79,560 |
| Geoffrey Romero | 134.8[12] | $500 | $67,400 |
| Expenses | | | $17,959.03 |
| **TOTAL** | | | **$250,444.03** |

---

[11] This total does not include gross receipts tax, as Plaintiff did not provide a figure for such taxes in the supplemental fees accounting.

[12] In his billing sheet, Mr. Romero did not total his hours worked, but did total his fees, based on a $500/hour fee. My calculation of the total hours matches with the total fees (at $500/hour), except for two minor discrepancies: (1) on page 2, line 3, Mr. Romero reports 1.3 hours worked for a total of $750, when 1.3 hours at $500/hour totals $650; and (2) on the last line of page 8, Mr. Romero lists $75 without a corresponding time entry. When changing the $750 to $650 and removing the $75, my calculation of hours matches Mr. Romero's calculation of fees.

v.  Lodestar Multiplier

Plaintiff requests a lodestar multiplier of nine, which would bring the attorneys' fees to $2,191,324.03.[13] Doc. 105 ¶ 17. I recommend, for several reasons, that the Court reject Plaintiff's suggestion to apply a multiplier of nine when calculating the lodestar as a cross-check to a percentage-of-the-fund calculation.

"A reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Perdue*, 559 U.S. at 552 (internal alterations and quotation marks omitted). "[T]he lodestar method yields a fee that is presumptively sufficient to achieve this objective." *Id.* "There is a strong presumption that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Id.* at 554 (internal alterations and quotation marks omitted). "Factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Id.* at 546. A lodestar multiplier of nine is unreasonable for several reasons.

First and foremost, multiplying Plaintiff's counsel's already high hourly rate of $500/hour by nine means Plaintiff is requesting that the Court award attorneys' fees at a rate of $4,500 per hour. This rate is simply not a reasonable rate in New Mexico and cannot pass the "heightened scrutiny" review the Tenth Circuit requires.

---

[13] Plaintiff's supplement states that she "requests that a multiplier of eight (9) be applied to the final number of hours and fees." Doc. 105 ¶ 17. However, the calculation Plaintiff provides reveals that she intended to seek a multiplier of nine, not eight. *Id.* ¶¶ 17-18.

Second, in addressing whether a lodestar enhancement of 75% was reasonable, the Supreme Court in *Perdue* set forth several rules. 559 U.S. at 542-43 Among these rules, the Supreme Court noted that "the burden of proving that an enhancement is necessary must be borne by the fee applicant" and that "an applicant seeking an enhancement must produce 'specific evidence' supporting the award to assure that the calculation is objective and capable of being reviewed on appeal." *Id*. at 543 (internal citations omitted). Here, Plaintiff fails to meet her burden to produce specific evidence that justifies a lodestar enhancement of 900%.

Relatedly, Plaintiff does not point to any specific factor to justify the enhancement that the lodestar calculation does not already take into account. She argues that the case presented novel and difficult issues, Doc. 105 at 4-5, but "the novelty and complexity of the issues are reflected in the number of hours spent on the case, as complicated litigation will demand more time." *Home Depot*, 931 F.3d at 1083 (citing *Blum v. Stenson*, 465 U.S. 886, 898-99 (1984)). And as the Supreme Court has pointed out, when conducting a lodestar analysis, strong policy reasons exist to avoid providing plaintiffs' attorneys a financial incentive to take high-risk cases.

Consider *City of Burlington v. Dague*, 505 U.S. 557 (1992). After a plaintiff prevailed in an action governed by a fee-shifting statute, the Supreme Court considered whether a district court "may enhance the fee award above the 'lodestar' amount in order to reflect the fact that the party's attorneys were retained on a contingent-fee basis and thus assumed the risk of receiving no payment at all for their services." *Id*. at 559. In considering attorneys' fees, the district court "declared that Dague's 'risk of not prevailing was substantial' and that 'absent an opportunity for enhancement, [Dague] would have faced substantial difficulty in obtaining counsel of reasonable skill and competence in this complicated field of law.' It concluded that 'a 25% enhancement is

33

appropriate, but anything more would be a windfall to the attorneys.' It therefore enhanced the

lodestar amount by 25% . . . ." *Id*. at 560.

The Supreme Court first addressed whether a lodestar calculation should be enhanced due

to the difficulty of establishing the legal and factual merits of the claim. *Id.* at 562. The Court

held that it should not, as this difficulty "is ordinarily reflected in the lodestar—either in the

higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the

attorney skilled and experienced enough to do so. Taking account of it again through lodestar

enhancement amounts to double counting." *Id*. at 562-63 (internal citations omitted).

The Court then addressed whether a lodestar calculation should be enhanced to account

for the risk an attorney assumes when taking a case on a contingency (meaning a risk that the

attorney will recover nothing at all). *Id.* at 563. The Court also answered this question in the

negative. *Id.* It reasoned:

> the consequence of awarding contingency enhancement to take account of this
> "merits" factor would be to provide attorneys with the same incentive to bring
> relatively meritless claims as relatively meritorious ones. Assume, for example,
> two claims, one with underlying merit of 20%, the other of 80%. Absent any
> contingency enhancement, a contingent-fee attorney would prefer to take the
> latter, since he is four times more likely to be paid. But with a contingency
> enhancement, this preference will disappear: the enhancement for the 20% claim
> would be a multiplier of 5 (100/20), which is quadruple the 1.25 multiplier
> (100/80) that would attach to the 80% claim. Thus, enhancement for the
> contingency risk posed by each case would encourage meritorious claims to be
> brought, but only at the social cost of indiscriminately encouraging
> nonmeritorious claims to be brought as well. We think that an unlikely objective
> of the "reasonable fees" provisions. These statutes were not designed as a form of
> economic relief to improve the financial lot of lawyers.

*Id.* (internal quotation marks and citation omitted). The present case, of course, concerns

contractual fee-shifting rather than statutory fee-shifting. Thus, the Supreme Court's holding in

*Dague* that "enhancement for contingency is not permitted under the fee-shifting statutes at

issue," *id.* at 567, does not bind the Court in the present case. Nonetheless, much of the Supreme

Court's rationale for this decision can also be applied to contractual fee-shifting cases. Accordingly, I find unpersuasive Plaintiff's arguments that the fee requested is justified in part by the risk associated with taking this case. *See Doc.* 97 at 7-8 (arguing, "[i]t is also significant that many reputable attorneys throughout New Mexico declined to participate in this case at its various stages, given the initial uniform denials of these claims, the tremendous risk, case costs and time expenditures for which there was no guaranteed return"); *id.* at 10 (arguing, "numerous courts have acknowledged the heightened risk presented by cases such as this where there is no road map and have recognized that counsel's acceptance of the risk supports an award of a substantial fee").

Lastly, to the extent Plaintiff argues the *Johnson* factors support her requested multiplier, Doc. 105 at 4, I reject that assertion. Although Plaintiff asserts that "[a]pplying a lodestar multiplier under the *Johnson* factors set out in Plaintiff's petition for attorneys' fee would provide reasonable fees in this case," the only factor she discusses in relation to the lodestar multiplier is the novelty and difficulty of the issue. *Id.* ¶ 18. As discussed above, this factor does not justify a multiplier in this case, much less a multiplier of 900%.

Further, the Supreme Court and Tenth Circuit have indicated that the *Johnson* factors should not carry great weight, if any, in the lodestar context. Specifically, in *Anchando v. Anderson, Crenshaw & Associates, L.L.C.*, the Tenth Circuit addressed an attorneys' fees dispute in a Fair Debt Collection Practices class action. 616 F.3d 1098, 1101 (10th Cir. 2010). The district court had awarded attorneys' fees using the lodestar method. *Id.* at 1102. The defendant appealed, in part, on grounds that the district court failed to explicitly address the "*Johnson* factors." *Id.* at 1103. In rejecting the defendant's argument, the Tenth Circuit wrote:

> The Supreme Court's very recent decision in *Perdue* only confirms our reluctance to disturb a presumptively valid lodestar fee determination on the basis of a

conclusory objection that *Johnson* factors were not discussed. In *Perdue* the Court appears to significantly marginalize the twelve-factor *Johnson* analysis, which it discounts as just "one possible method" that "gave very little actual guidance" and, due to its "series of sometimes subjective factors, produced disparate results." 130 S. Ct. at 1671-72 (quotation omitted). The *Perdue* Court clearly embraces the lodestar approach as the preferable alternative to the *Johnson* analysis, noting that the lodestar approach "achieved dominance in the federal courts after *Hensley*, *Gisbrecht v. Barnhart,* 535 U.S. 789, 801 (2002)," and has "become the guiding light of our fee-shifting jurisprudence." 130 S. Ct. at 1672 (also noting that "unlike the *Johnson* approach, the lodestar calculation is objective" and hence "produces reasonably predictable results") (quotations omitted). We do not suggest that the *Johnson* factors have become irrelevant; *Perdue* did not overrule *Hensley*'s allowance that under appropriate circumstances they may be useful in determining subsequent ad hoc adjustments to the lodestar, *see Hensley*, 461 U.S. at 434 & n.9 (also noting, however, "that many of the *Johnson* factors usually are already subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate"). But, after *Perdue*, it has only become clearer that the lodestar determination is primary and that the propriety of such a determination is not automatically called into doubt merely because the trial court did not expressly discuss the *Johnson* factors.

*Id.* at 1103-04 (internal alterations and footnote omitted); *see also Dague*, 505 U.S. at 565-66

(stating, since deciding *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483

U.S. 711, (1987), the Supreme Court has "generally turned away from the contingent-fee

model—which would make the fee award a percentage of the value of the relief awarded in the

primary action—to the lodestar model") (internal citation and quotation omitted); *Syngenta*, 661

F.4th at 1193 (Tenth Circuit holding that "we have acknowledged that the *Johnson* factors'

applicability and weight in common fund situations will undoubtedly be different than in

statutory fee situations . . . ." (alterations omitted)).

   vi.  <u>Fee to Award</u>

   In sum, I recommend that the Court not apply a multiplier when calculating the lodestar

amount. Under the lodestar calculation, attorneys' fees equal $250,444.03. Using this amount as

a cross-check against the percentage-of-the-fund calculations reveals that an award of 33.33% of

the fund ($1,787,222.86) is significantly higher than the lodestar amount. I therefore recommend

that the Court reduce the percentage to 20% of the fund, which brings the attorneys' fees much closer to the lodestar cross-check amount. *See Home Depot*, 931 F.3d at 1076 ("In [the Eleventh Circuit], courts typically award between 20–30%, known as the benchmark range."); *In re Samsung*, 997 F.3d at 1095 (citing with approval *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774–75 (11th Cir. 1991) for the proposition that "[t]he majority of common fund fee awards fall between 20% and 30% of the fund"). Under that percentage, the total fund equals $4,468,057.16,[14] and the attorneys' fees equal $893,611.43. Although this amount is significantly less than the $2,225,000 requested by Plaintiff, the actual payout to the class (less than $3.4 million, not including administrative and attorneys' fees) is also significantly less than Plaintiff's predictions of $15 million, Doc. 82 at 14, or $22 million, Doc. 97 at 14.

   **f.   The *Johnson* factors indicate that a 20% fee is reasonable.**

   Lastly, although the *Johnson* factors may have limited usefulness when using a lodestar calculation, they are more relevant when evaluating the reasonableness of a percentage-of-the-fund amount. *See Syngenta*, 61 F.4th at 1193 (in the common fund context, the court stated, "we further require district courts to consider the factors outlined in *Johnson* regardless of which method [lodestar or percentage-of-fund] is used" (citation omitted)). A review of these factors supports my recommendation that the Court award 20% of the actual class benefit, or $893,611.43.

---

[14] This amount includes $1,042,333 for wrongful death claims; $120,000 for Option 1 claims; $2,200,000 for Option 2 claims; and $212,112.73 for administrative costs. The sum of these amounts is $3,574,445.73. If $3,574,445.73 represents 80% of the settlement, each 20% share equals $893,611.43. Adding $893,611.43 of attorneys' fees to the $3,574,445.73 of non-attorney fee benefits the class received yields a total benefit to the class of $4,468,057.16.

i.   The time and labor required

Plaintiff argues that class counsel filed, defended, and attended motion hearings as well as prepared for and attended multiple mediation sessions, which helped craft "a fair and reasonable settlement agreement." Doc. 97 at 9. I agree that class counsel worked efficiently and was able to reach a settlement beneficial to the class. Awarding counsel $893,611.43 well compensates Plaintiff's counsel for that time and labor given that this amount is over three times the amount they would receive under a lodestar calculation.

ii.   The novelty and difficulty of the questions

Plaintiff argues that, since the New Mexico Supreme Court decided the *Schmick* offset in 1985, "not a single lawyer had ever challenged the offset like Plaintiffs' counsel has." Doc. 97 at 10. While I agree that this case presented a novel issue, Plaintiff's counsel brought a series of related cases against different insurance companies based on the same UIM offset theory. *See, e.g.*, *Crutcher v. Liberty Mut. Ins. Co.*, 2022-NMSC-001, 501 P.3d 433; *Bhasker v. Fin. Indem. Co.*, No. 1:17-CV-00260-KWR-JHR, 2023 WL 4534548, at *1 (D.N.M. July 13, 2023); *Martinez v. Progressive Preferred Ins. Co.*, No. 1:19-CV-00004-JHR-SCY, 2023 WL 2474731, at *1 (D.N.M. Mar. 13, 2023); *Smith v. Interinsurance Exch. of the Auto. Club*, No. 1:22-CV-00447-WJ, 2022 WL 17093456, at *1 (D.N.M. Nov. 21, 2022); *Palmer v. State Farm Mut. Auto. Ins. Co.*, 584 F. Supp. 3d 1018, 1022 (D.N.M. 2022). Some of these cases have already settled and counsel have received their requested attorneys' fees. *See* Doc. 97 at 7. Moreover, most of the difficult work benefiting this case was done in a separate case before the New Mexico Supreme Court for which counsel will be separately compensated. Indeed, proceedings in the present case have mostly been stayed pending the New Mexico Supreme Court's decision in a

38

separate case. Thus, the attorneys' fees I recommend in the present case will amply compensate Plaintiff's counsel for re-raising an issue that was novel when raised in another case.

   iii. <u>The skill required to perform the service properly</u>

  Plaintiff argues that a high degree of skill was required to perform the legal services in this case, because it was "very specialized as to automobile insurance matters." Doc. 97 at 10. I agree with this assertion and find that awarding counsel $893,611.43 well compensates them for the specialized skill, especially given that this amount is significantly higher than the lodestar cross-check (which itself used a higher-than-average hourly rate).

   iv. <u>The preclusion of other employment by the attorney due to acceptance of the case</u>

  As to factor four, Plaintiff states that "[t]he preclusion of other employment is solely based upon the time involved to represent the Class Members in this matter versus the time that could have been spent on other matters, including other auto-insurance class actions which are currently pending with representation by Class Counsel, herein." Doc. 97 at 12. I do not find that this argument favors a higher award as class counsel was successfully able to litigate several similar class action lawsuits around the same time as the present one. *See, e.g.*, *Crutcher*, 2022-NMSC-001; *Bhasker*, 2023 WL 4534548; *Martinez*, 2023 WL 2474731; *Smith*, 2022 WL 17093456; *Palmer*, 584 F. Supp. 3d 1018. Additionally, all together, Plaintiff's counsel only billed a few hundred hours over the nearly five-year life of this case, indicating it would not have precluded them from other work.

   v. <u>The customary fee</u>

  As discussed above, although this case does not involve a common fund, because of the specifics of the settlement, paying a percentage-of-the-fund is more consistent with how plaintiffs' counsel are typically paid and I am using the lodestar calculation only as a cross-

check. Thus, this factor weighs in favor of paying Plaintiff's counsel a percentage of the fund at the low end of what is typical in the Tenth Circuit. *See In re Samsung*, 997 F.3d at 1095 (citing with approval *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774–75 (11th Cir. 1991) for the proposition that "[t]he majority of common fund fee awards fall between 20% and 30% of the fund").

### vi. <u>Whether the fee is fixed or contingent</u>

Plaintiff argues that "the fee was contingent upon the outcome and the Plaintiff's attorneys have labored to this point for nearly five years without knowing the outcome of whether they would even ever obtain compensation." Doc. 97 at 13. In statutory fee-shifting cases, an enhancement for taking a case on contingency is disfavored. Considering contingency risk implicates "the social cost of indiscriminately encouraging nonmeritorious claims to be brought." *Dague*, 505 U.S. at 563; *Home Depot*, 931 F.3d at 1084. This same rationale applies to contractual fee-shifting cases. *Charlie*, 2023 WL 4591167, at *15. However, to the extent the Court finds an enhancement for risk to be appropriate, I reiterate that my recommended fee award provides Plaintiff's counsel significantly more than what they would receive using a lodestar. I do not recommend further increasing the award based on this risk factor.

### vii. <u>Time limitations imposed by the client or the circumstances</u>

I am unaware of any significant time limitations. Plaintiff merely indicates that "[t]he time limitations and circumstances imposed followed the federal court's scheduling order." Doc. 97 at 13. However, the Court never entered a formal scheduling order as the case was stayed for the majority of its existence, first pending resolution of the certified question in *Crutcher*, then pending resolution of a motion to dismiss, and lastly while the parties negotiated a settlement.

viii. <u>The amount involved and the results obtained</u>

Plaintiff asserts that the "results obtained here are objectively broad, equitable and impressive in scope." Doc. 97 at 13. I agree that Plaintiff's counsel obtained a good result for the class. Nonetheless, this result turned out to be much less than the result estimated at the time the parties negotiated the $2,250,000 attorney fee cap. At various times during the settlement approval process, Plaintiff speculated that the total benefit to the class "may exceed $15,000,000," Doc. 82 at 14, or "could be as much as $22,100,000," Doc. 97 at 14. Given that those possibilities did not materialize and that the actual benefit to the class is roughly $3.5 million (including administrative fees, but not attorneys' fees), this factor favors awarding Plaintiff's counsel less in attorneys' fees than requested at a time when the expected payout to the class was more than four times higher than the payout that actually materialized.

ix.  <u>The experience, reputation, and ability of the attorney</u>

Similar to factor three, Plaintiff argues that class counsel are "well-known and highly skilled New Mexico litigators" and that there "can be no question but that the hard-fought Settlement would not have been possible if Plaintiff[s] were not represented by such experienced and skilled litigators." Doc. 97 at 10, 11. Again, although I agree with these statements, the experience, reputation, and ability of Plaintiff's attorneys is reflected in their lodestar hourly rate. Using a lodestar hourly rate which is at the top of what attorneys in New Mexico charge, a lodestar calculation would still provide Plaintiff's counsel much less than the amount I am recommending. Thus, a lodestar cross-check, which takes this factor into consideration, favors no more than a 20% fee.

x.   The undesirability of the case

Plaintiff asserts that "many reputable attorneys throughout New Mexico declined to participate in this case at its various stages, given the initial uniform denials of these claims, the tremendous risk, case costs and time expenditures for which there was no guaranteed return." Doc. 97 at 7-8; *see also id.* at 14. However, as discussed above, this case is similar to many other insurance class actions that make up class counsel's practice. Although these cases presented a novel question, I do not view such cases as undesirable. To the contrary, because the present case is similar to a separate case that litigated the offset issue with the New Mexico Supreme Court, litigation in the present case mostly has been stayed. Based on work done in a separate case for which Plaintiff's counsel will be separately paid, Plaintiff's counsel was able to obtain a significant recovery in the present case without having to engage in significant litigation or assume a significant amount of risk. This makes the present case more desirable than undesirable.

xi.   The nature and length of the professional relationship with the client

Plaintiff explains that the named Plaintiff, Ms. Belanger, "was originally represented by a different law office for her car crash of September 2, 2014, and was later referred to Class Counsel to explore her options regarding the offset and her underinsured motorist benefits." Doc. 97 at 14-15. I do not view this information as relating to or justifying a higher percentage of the fund.

xii. Awards in similar cases

Plaintiff again points to cases in which courts have approved percentage-of-the-fund fees in the amounts of 33.33%, 35%, and 40%. Doc. 97 at 15. However, percentages is this range are not automatic and are often inappropriate. For example, 33% of a $5 million recovery where

attorneys worked 10,000 hours is different than 33% of a $5 million dollar recovery where attorneys worked less than 500 hours. The former is more reasonable than the latter. When heightened scrutiny applies, courts should not blindly apply a percentage with no regard to what hourly rate such application would produce. Given the lodestar cross check, this factor favors a 20% fee. *See also In re Samsung*, 997 F.3d at 1095 (citing with approval *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774–75 (11th Cir. 1991) for the proposition that "[t]he majority of common fund fee awards fall between 20% and 30% of the fund").

## 5. Class Representative Service Award

Plaintiff requests that the Court award an incentive fee to the named Plaintiff in the amount of $10,000. Doc. 97 at 15-16. "Incentive awards [to class representatives] are justified when necessary to induce individuals to become named representatives," or "a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class." *UFCW Loc. 880-Retail Food Emps. Joint Pension Fund v. Newmont Min. Corp.*, 352 F. App'x 232, 235 (10th Cir. 2009) (internal quotation marks and citation omitted). Indeed, "courts regularly give incentive awards to compensate named plaintiffs for the work they performed—their time and effort invested in the case." *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 468 (10th Cir. 2017).

Here, Ms. Belanger has been involved with this case for over five years and has been actively involved in the litigation, including attending the mediation in person. I find that her time and effort invested in the case justifies the requested incentive award. I also find that the requested award is reasonable and in line with awards approved in other cases. *See Bhasker v. Fin. Indem. Co.*, No. 1:17-CV-00260-KWR-JHR, 2023 WL 4534548, at *1 (D.N.M. July 13,

2023) ($25,000 incentive fee in a similar UIM offset case); *Acevedo v. Sw. Airlines Co.*, No. 1:16-CV-00024-MV-LF, 2019 WL 6712298, at *4 (D.N.M. Dec. 10, 2019) (collecting cases that approved incentive fees from $10,000 to $15,000), *report and recommendation adopted*, No. 1:16-CV-00024-MV-LF, 2020 WL 85132 (D.N.M. Jan. 7, 2020); *Chieftain Royalty Co.*, 888 F.3d at 464 (noting a study of cases from 2006 to 2011 which found the average incentive award to be $11,697 and the median to be $5,250). I therefore recommend approving the incentive award.

## RECOMMENDED FINDINGS

For these reasons, I recommend GRANTING IN PART and DENYING IN PART the Unopposed Motion and Memorandum of Law in Support of Class Plaintiffs' Petition for Award of Attorneys' Fees, Costs, and Award of Incentive Fee to Named Plaintiff (Doc. 97). I recommend that the Court award attorneys' fees, inclusive of taxes and costs, in the amount of $893,611.43 and award an incentive fee to the named Plaintiff in the amount of $10,000.00.

Steven C. Yarbrough
United States Magistrate Judge

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**